**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WALTER HALL,

                 Plaintiff,

vs.                                       Case No. 3:07-cv-1053-J-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                 Defendant.
_____/

## OPINION AND ORDER[1]

### I.  Status

Walter Hall ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits.  His alleged inability to work is based on the following impairments: "degenerative disc disease, . . . disc bulging of both the lumbar and cervical spine. . . cervical spondylosis and bilateral foramenal encroachment. . . and severe recurrent major depression."  Transcript of Administrative Proceedings ("Tr.") at 285; see also id. at 117-18.  Plaintiff was found not disabled by Administrative Law Judge ("ALJ") Stephen C. Calvarese, in a decision entered on May 9, 2007.  Id. at 12-19.  Plaintiff has exhausted the available administrative remedies and the case is properly before the Court.

---

[1]     The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  See Notice, Consent, and Order of Reference - Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 9).

Plaintiff argues the ALJ's finding that Plaintiff does not suffer from a severe mental impairment at step two of the sequential evaluation process is not supported by substantial evidence in the record. Memorandum in Support of Plaintiff's Appeal of the Commissioner's Decision (Doc. No. 11; "Pl.'s Mem.") at 10-15. Plaintiff further contends that as a result of the erroneous finding regarding Plaintiff's mental impairment, the ALJ improperly assessed his Residual Functional Capacity ("RFC"). Id. at 16-17. The undersigned concludes that the ALJ's finding regarding Plaintiff's mental impairment is supported by substantial evidence in the record, as is the ALJ's assessment of Plaintiff's RFC. Accordingly, the Commissioner's decision will be **AFFIRMED**.

## II. Background

Plaintiff was fifty-three years old when his hearing was held before the ALJ on April 26, 2007. See Tr. at 65, 281. Plaintiff alleges the onset date of disability was February 17, 2005. Id. at 114, 118, 298. Plaintiff's past relevant work includes working as a customer service representative, a janitor, and a shipping and receiving supervisor. Id. at 299-301; see also id. at 104, 131, 133. Plaintiff completed the twelfth grade, with no other vocational training and some on-the-job training. Id. at 293-94; see also id. at 126. Because Plaintiff's appeal focuses solely on his alleged mental impairment, the undersigned summarizes only the medical evidence pertinent to his appeal.

**A.     Relevant Treatment Documentation**

The earliest sign of a possible mental impairment occurred in April 2005, when Plaintiff was apparently committed for a mental evaluation under the Baker Act[2] by Dr. Eric Schramm ("Dr. Schramm"), Plaintiff's then-treating physician. See Tr. at 162. According to a May 6, 2005 narrative summary by Dr. John E. Carey, M.D. ("Dr. Carey"), a physician evaluating Plaintiff due to pain complaints approximately one month after the commitment, Plaintiff was "Baker Acted" by Dr. Schramm on April 1, 2005.[3] Id. Dr. Carey summarized the occurrence as follows:

> The patient described that he initially received a referral to Dr. Cole's pain clinic on Sunbeam Road. He states he showed up to the initial assessment, and unfortunately, this visit was cancelled. He was very upset. He presented to Dr. Schramm's office without an appointment requesting a refill of his medications, specifically Avinza. No prescriptions were provided to the patient during that unscheduled visit. The patient states he verbalized a suicidal ideation. When questioned on this, the patient states this was an idle threat, that he had no plan and no prior suicidal tendencies or behaviors. He was Baker Acted, taken to Baptist Medical Center by the Jacksonville Sheriff's Office. He was treated for about two hours and then released with pending psychological evaluation. His first psychological evaluation is scheduled later on today. The patient denies any previous suicidal tendencies. He denies current plans. He denies suicidal or homicidal ideations today, although he is cooperative to follow up with Psychiatry.

Id.

On April 22, 2005, less than a month after Plaintiff was committed for an evaluation pursuant to the Baker Act, Plaintiff appeared for a new patient consultation with Javier

---

[2]     See Fla. Stat. § 394.463 (providing criteria to commit a person for an involuntary examination due to a perceived mental illness).

[3]     The only documented evidence of this alleged occurrence appears in Dr. Carey's May 6, 2005 narrative summary. See Tr. at 162. Neither party appears to contest that Plaintiff was committed for evaluation under the Baker Act. See Pl.'s Mem. at 3-4; Memorandum in Support of the Commissioner's Decision (Doc. No. 13) at 4. Accordingly, the undersigned accepts the allegation as true.

Garcia-Bengochea, M.D. ("Dr. Bengochea"). Id. at 140-42. Although Plaintiff was seen by Dr. Bengochea regarding complaints of neck pain, the doctor noted Plaintiff's "mood and affect [were] appropriate." Id. at 140-41. Dr. Bengochea also opined Plaintiff could "return to work." Id. at 142.

On May 6, 2005, Plaintiff appeared at the Jacksonville Spine Center ("JSC") for an evaluation, having been referred by Dr. Bengochea. Id. at 162-64. Dr. Carey[4] of JSC noted Plaintiff's "most bothersome complaint. . . [was] neck pain." Id. at 162. Dr. Carey summarized Plaintiff's description of his previous commitment under the Baker Act. Id. at 162. He opined Plaintiff was "[p]ositive for depression, positive for anxiety, positive for insomnia. Negative for suicidal or homicidal ideations."[5] Id. at 163.

Also on May 6, 2005, Plaintiff apparently began treatment at A.P. Psychiatric & Counseling Services ("APPCS"). Id. at 274-75. The only evidence in the record of treatment at APPCS beginning in early May 2005 appears in a letter addressed "To whom it may concern" and dated May 20, 2005, authored by John R. Staggs, L.M.H.C. ("Mr. Staggs") and Anjali A. Pathak, M.D. ("Dr. Pathak").[6] See id. at 274. According to the letter, Plaintiff had been treated by APPCS since May 6, 2005. Id. At the time the letter was written, Mr. Staggs and Dr. Pathak indicated Plaintiff suffered from "clear evidence of Major

---

[4] Dr. Carey was apparently treating Plaintiff in conjunction with Erin Hornish, P.A.-C. Tr. at 164.

[5] Plaintiff was seen at JSC on several occasions from June 3, 2005 through July 15, 2005 for cervical epidural steroid injections, as well as lumbar epidural steroid injections. See Tr. at 150-61. On August 5, 2005, he was seen for a follow-up appointment regarding the injections. See id. at 148-49.

[6] Although the letter authored by a mental health counselor and a doctor at APPCS indicated Plaintiff began treatment there on May 6, 2005, Tr. at 274-75, the first treatment notes in the record from APPCS are dated June 3, 2005. See id. at 172-73.

Depressive Disorder, Recurrent, Severe." Id. at 274. Mr. Staggs and Dr. Pathak further opined, "[Plaintiff's] current condition is one of temporary total disability." Id. at 275.

It appears most of Plaintiff's visits at APPCS were with Betty Killian, A.R.N.P. ("Nurse Killian"). Id. at 166-74. During his first documented visit on June 3, 2005, Plaintiff indicated he had been depressed for the past six months, but had become suicidal within the past two weeks. Id. at 172. He was feeling "helpless, worthless[,] . . . [and] exhausted." Id. He further reported "hurt[ing] all the time[.]" Id. At that time, Plaintiff was taking the medication Elavil. Id. Under the section entitled "Mental Status," it was noted that Plaintiff was "well groomed," was "worr[ied]" and "nervous," was "sad" with "low energy," had "blunted" affect, had "goal directed" thought, and was "cooperative." Id. at 173. Plaintiff was diagnosed with M[ajor] D[epressive] D[is]o[rder], Rec[urrent], Severe[.]" Id. He was assigned a Global Assessment of Functioning ("GAF") score of forty. Id.

During the June 3, 2005 visit, the plan was to begin Plaintiff on Zoloft and continue Elavil. Id. at 168. Thereafter, notes from June 17, 2005 solely document an increase in the dosage of Zoloft. Id. On June 20, 2005, Nurse Killian filled out a "Functional Mental Status Evaluation," in which she opined Plaintiff's "judgment [was] impaired" and he was "unable to focus/concentrate."[7] Id. at 270-72. When asked about the functional abilities Plaintiff had retained, Nurse Killian responded, "Pt. can get help–take meds–do therapy–try to get better–[.]" Id. at 271. Nurse Killian thought Plaintiff could not perform any job tasks at that time, "except very rudimentary" ones. Id.

---

[7] This Evaluation was filled out at the request of Plaintiff's private insurance company, apparently after Plaintiff filed some sort of disability claim through that company. See Tr. at 269-70.

On June 24, 2005, Plaintiff told Nurse Killian, "'I can't get out of this depression,'" although he reported sleeping better with the new medication. Id. at 171. The plan was to increase the dosage of Zoloft. Id. at 171, 168. On July 1, 2005, Plaintiff reported the "'depression hasn't changed[.]'" Id. at 171. The dosage of Zoloft was increased once again. Id. at 171, 168. On July 8, 2005, Plaintiff "'[could not] stop shaking,'" apparently because he was very worried about his insurance benefits not being paid and "'afraid [he was] going to be homeless.'" Id. at 170. The medications stayed the same. Id. at 170, 168. On July 15, 2005, Plaintiff reported "sleeping better" despite waking up several times per week sweating. Id. at 170. The dosage of Zoloft was increased at that time. Id. at 170, 168. On July 25, 2005, Plaintiff reported being worried about a possible termination at work. Id. at 170. Similarly, when seen on August 15, 2005, Plaintiff's worries centered around "losing [his] insur[ance]" due to a termination. Id. at 169. On August 24, 2005, Plaintiff reported his "'depression[] [was] getting better[.]'" Id. The last documented treatment at APPCS occurred on September 14, 2005. Id. at 167. During that session, Plaintiff indicated "'the main thing . . . bothering [him was] that [he could not] be productive anymore.'" Id. However, Plaintiff reported "'laughing more [at] jokes[.]'" Id. The plan was to continue with his medications (consisting of Zoloft, Seroquel, and Wellburtrin). Id. at 167, 166.

About seven months later, on April 18, 2006, Plaintiff was seen for a psychiatric evaluation by Hazem Herbly, M.D. ("Dr. Herbly") at Shands Jacksonville, having been referred by his primary physician, Dr. Eric Stewart. Id. at 233, 267; see also id. at 238-40. During the evaluation, Plaintiff complained mainly of depression. Id. at 233. Dr. Herbly noted Plaintiff's "history of chronic depression" which "became more severe about a year

ago." Id. Plaintiff's depression had apparently "worsened" because of financial problems associated with not being able to work. Id. Dr. Herbly added, "There is no actual psychotic component" and "no actual hallucinations or delusions." Id. Under the section entitled, "MENTAL STATE," Dr. Herbly wrote:

> Somewhat passive and meek. Adequate eye contact. Behavior also somewhat regressive and dependent. Mood is depressed [;] he became very tearful when he remembered his mother[']s death. Affect is full and appropriate. Speech is coherent and logical, no delusions, no hallucinations. No active suicide ideas. Cognitive functions are intact. His score on the Mini-Mental Status Exam is 30/30. Score on the BECK is 52.

Id. at 267. Plaintiff was diagnosed with "Recurrent major depressive disorder," "Dysthymic disorder," and "Posttraumatic stress disorder, mostly resolved[.]" Id. He was assigned a GAF score of forty-five. Id. The plan was to "[s]tart psychological intervention." Id. Plaintiff was given samples of the medication Lexapro. Id.

On May 16, 2006, Plaintiff was seen by Dr. Herbly for a follow-up visit. Id. at 230. At that time, he reported "some improvement in his symptoms." Id. Specifically, he indicated he had fewer "crying spells" and more energy. Id. Generally, his mood had improved. Id. Plaintiff was directed to continue taking Lexapro, and to start Trazodone at bedtime. Id. Additionally, he was directed to "[m]ake [an] appointment for psychological treatment." Id.

On June 1, 2006, Plaintiff had his first therapy session with Ed R. Paat, M.S., L.M.F.T. ("Mr. Paat"), having been referred for psychological intervention by Dr. Herbly. Id. at 237, 230. During the session, Mr. Paat assessed Plaintiff's "depression and general function." Id. Plaintiff's "expression of mood was sad," and "affect was congruent." Id. Plaintiff did "report problems with sleep and feeling weak." Id. He had apparently "thought

of suicide," but he did not have any actual plans of suicide.  <u>Id.</u>  He was concerned about his financial inability to afford his medications.  <u>Id.</u>  The treatment plan was to "[c]ontinue counseling and medication management."  <u>Id.</u>

During the next session on June 15, 2006, Mr. Paat noted Plaintiff had "No PTSD symptoms, suicidal ideation, or psychotic symptoms."  <u>Id.</u> at 236.  The treatment plan was the same.  <u>Id.</u>  Plaintiff's prognosis was "guarded[.]"  <u>Id.</u>  On July 11, 2006, Plaintiff was seen by Dr. Herbly for a follow-up.  <u>Id.</u> at 222.  Dr. Herbly noted Plaintiff "endorse[d] several other symptoms of depression including low energy, insomnia, decreased motivation, and suicidal ideas."  <u>Id.</u>  The doctor further indicated Plaintiff had "no motivation to try to improve his situation, and he seems to be expecting to be helped and to be given more money from Social Security and to be provided with complete pain relief without any effort on his part."  <u>Id.</u>  Plaintiff's dose of Lexapro was increased on that visit.  <u>Id.</u>  On July 26, 2006, Mr. Paat observed Plaintiff's "affect was congruent and surprisingly open to self-disclosure - a sharp contrast to his passive posturing in his recent visit."  <u>Id.</u> at 235.  Mr. Paat indicated, "With his behavior today, prognosis appears to be better than thought from his previous visit."  <u>Id.</u>  The last documented visit occurring at Shands Jacksonville was with Dr. Herbly on February 14, 2007, when Plaintiff reported feeling tired, having somewhat low energy, but having an "adequately controlled" mood with "no suicidal ideas."  <u>Id.</u> at 217.  Plaintiff was directed to continue with the Lexapro and follow-up in three months.  <u>Id.</u>

**B.     Psychiatric Assessments**

There are two psychiatric assessments in the record, authored by consultative psychologist J. Patrick Peterson, Ph.D., J.D. ("Dr. Peterson") and consultative psychiatrist Alejandro F. Vergara, M.D. ("Dr. Vergara"), completed at the request of the Social Security Administration and dated October 19, 2005 and January 5, 2006 respectively.  Tr. at 174-87, 196-201.  In the October 19, 2005 assessment, Dr. Peterson opined Plaintiff's medical disposition was not severe.  Id. at 174.  Plaintiff was diagnosed with "Adjustment Reaction w/Mixed Emotional Features"; specifically, Listing 12.04 (Affective Disorders) was identified as the relevant Listing.  Id. at 177, 184.  Dr. Peterson assigned functional limitations of "Mild" in the following areas: "Restrictions of Activities of Daily Living"; "Difficulties in Maintaining Social Functioning"; and "Difficulties in Maintaining Concentration, Persistence, or Pace[.]"  Id. at 184.    Dr. Peterson opined Plaintiff did not suffer from any "Episodes of Decompensation[.]"  Id.  Regarding the findings made under Section 12.04, Dr. Peterson indicated the "C" criteria was not met.  Id. at 185.  Under the section entitled "Consultant's Notes," Dr. Peterson opined, "Psych condition is Not Severe & the claimant remains capable of adequate functioning in a full range of routine ADL's w/in his physical & motivational/volitional parameters."  Id. at 186 (capitalization omitted).

In the January 5, 2006 assessment, Dr. Vergara similarly opined Plaintiff's medical disposition was not severe.  Id. at 196.  He believed Plaintiff suffered from "Adjustment Disorder with mixed depressed and anxious mood," citing Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders).  Id. at 197, 199.  Dr. Vergara came to the same conclusions as Dr. Peterson regarding Plaintiff's functional limitations ("Mild" in the

first three areas with no episodes of decompensation). Id. at 199. Under "Consultant's Notes," Dr. Vergara stated, "Mental condition considered, not severe. Disability[,] if any, may be physical in nature." Id. at 200 (capitalization omitted).

### C. The ALJ's Decision

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry described in the Code of Federal Regulations, determining as appropriate whether the Plaintiff: 1) is currently employed;  2) has a severe impairment;  3) is disabled due to an impairment meeting or equaling one listed in the regulations;  4) can perform past relevant work;  and 5) retains the ability to perform any work in the national economy. See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).

After assessing Plaintiff's file, testimony, and medical and psychological history, the ALJ determined Plaintiff suffered from the "severe" impairment of "back disorder[.]" Tr. at 14. The ALJ did not consider the combination of Plaintiff's "affective disorder and anxiety disorder" to be a severe impairment. Id. That conclusion was based on "treating notes from [APPCS] and Shands Jacksonville. . . and the claimant's reported activities of daily living." Id. Further, the ALJ noted Plaintiff's "depression and anxiety [have] apparently responded to medication and result[] in no more than mild limitation of function." Id. Finally, citing the psychiatric assessments of Dr. Peterson and Dr. Vergara, the ALJ found Plaintiff's "mental impairment does not satisfy the 'C' criteria of the mental listings." Id. at 14-15. Accordingly, the ALJ determined Plaintiff's impairment does not result in one of the established impairments listed in the regulations. Id. at 15. Relying on the testimony of Jack Turner,

an impartial vocational expert, the ALJ found that Plaintiff is capable of performing his relevant work as a customer service representative and shipping/receiving supervisor. Id. at 18. In a decision entered on May 9, 2007, the ALJ ruled Plaintiff is not disabled for purposes of receiving disability insurance benefits and denied his claim. Id. at 19.

### III. Legal Standard

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). It is not for this Court to reweigh the evidence; rather, this Court reviews the entire record to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## IV. Discussion

Plaintiff argues the ALJ's finding at step two of the sequential evaluation process that Plaintiff's mental impairment is not severe is not supported by substantial evidence in the record. Pl.'s Mem. at 10-18. Further, Plaintiff contends that because the ALJ found Plaintiff's mental impairment is not severe, the ALJ erroneously omitted his mental functioning limitations from the RFC determination. Id. at 16. Each argument is discussed in turn.

### A.     The ALJ's Finding at Step Two of the Sequential Evaluation Process

At step two of the sequential evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. See 20 C.F.R. § 404.1520(a)(4)(ii). At this step, "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work[.]" Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984). "[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). In the context of a Social Security disability benefits case, a condition is severe if it affects a claimant's ability to maintain employment. See id. A claimant has the burden of proving that his allegations of depression and other mental health issues constitute severe impairments. Nigro v. Astrue, No. 8:06-cv-2134-T-MAP, 2008 WL 360654, at *3 (M.D. Fla. Feb. 8, 2008) (unpublished); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (stating "[a] claimant bears a heavy burden of establishing the existence of a disability [by first showing]

that her impairment prevents her from performing her previous work"). Further, "[t]he severe impairment either must have lasted or must be expected to last for at least 12 months." Davis v. Barnhardt, No. 06-11021, 186 F. App'x 965, 967 (11th Cir. 2006) (unpublished) (citing Barnhart v. Walton, 535 U.S. 212, 216 (2002)).

A severe impairment interferes with a claimant's ability to perform "basic work activities." See Bowen v. Yuckert, 482 U.S. 137, 148 (1987). The Code of Federal Regulations provides six examples of "basic work activities": (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and unusual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b); see also Davis, 186 F. App'x at 966-967.

Here, despite the low standard a claimant must meet at step two to show that his impairment is severe, a comprehensive review of the record demonstrates the ALJ's determination that Plaintiff's mental impairment is not severe is supported by substantial evidence. While there is significant evidence in the record of Plaintiff's somewhat recent history of treatment for depression--he has been treated and evaluated by a number of medical and psychological professionals--Plaintiff failed to meet his burden of establishing that his depression constitutes a severe impairment. See Nigro, 2008 WL 360654, at *3. Plaintiff's arguments can be divided into six specific ways in which Plaintiff believes the ALJ's decision that he does not suffer from a severe mental impairment is not supported by substantial evidence. Each is discussed in turn.

First, Plaintiff points out that the ALJ did not comment on the April 1, 2005 Baker Act commitment in finding Plaintiff does not suffer from a severe mental impairment. <u>See</u> Pl.'s Mem. at 12. It appears the first documented evidence of Plaintiff's possible psychological issues occurred when he was committed by Dr. Schramm for a psychological evaluation pursuant to the Baker Act. <u>See</u> Tr. at 162. However, review of the only evidence in the record of this commitment (Plaintiff's recollection of the circumstances surrounding the commitment to another treating physician about a month after its occurrence) shows that Plaintiff was committed for expressing a suicidal ideation, which he later confirmed was merely an idle threat, in order to receive pain medication. <u>See</u> <u>id.</u> at 162. Plaintiff was apparently upset his appointment at the pain clinic was cancelled, and he went to Dr. Schramm's office "requesting a refill of his medications[.]" <u>Id.</u> When Plaintiff was notified his prescriptions would not be refilled without an appointment, he apparently "verbalized a suicidal ideation," causing Dr. Schramm to become concerned and commit him involuntarily for evaluation. <u>Id.</u> Plaintiff was "treated for about two hours" before being released. <u>Id.</u> Plaintiff later told Dr. Carey the suicidal ideation was "an idle threat." <u>Id.</u> Following the involuntary commitment, Plaintiff was referred for a psychological evaluation by APPCS. <u>Id.</u> at 172-73, 274-75. Although there is no documentation in the record of the first evaluation by APPCS occurring on May 6, 2005, the ALJ specifically discussed the first documented treatment, occurring on June 3, 2005. <u>See</u> <u>id.</u> at 17. There being minimal reference in the record of the commitment pursuant to the Baker Act, and no direct evidence of the occurrence and/or diagnoses resulting therefrom, the undersigned finds no discernible error on the part of the ALJ for not commenting on it.

Second, Plaintiff cites a letter dated May 20, 2005 from Mr. Staggs and Dr. Pathak of APPCS addressed "To whom it may concern[.]" See Pl.'s Mem. at 12 (citing Tr. at 274-75). Specifically, Plaintiff argues the assessment of "temporary total disability" in the letter contradicts the ALJ's finding that Plaintiff's mental health condition is not severe. Pl.'s Mem. at 12. The ALJ discounted that opinion, explaining as follows:

> The opinion that the claimant is disabled is an opinion that is reserved to the Commissioner and, thus, is never entitled to controlling weight or special significance. At the time the opinion was rendered, there [was] no evidence of what the claimant's mental status was and, in fact, the evidence indicates that he was not actually evaluated until June 3, 2005 (Exhibit 5F). Therefore, the undersigned concludes that this opinion cannot be adopted.

Tr. at 18 (citing id. at 274-75). The ALJ was correct in his assertion that the Commissioner decides the question of disability. "[T]he question of whether a claimant has a severe impairment or is disabled (that is, unable to work within the strictures of the Social Security Act) is reserved to the Commissioner, not a physician." Parsons v. Astrue, No. 5:06cv217/RS-EMT, 2008 WL 539060, at *7 (N.D. Fla. Feb. 22, 2008) (unpublished) (citing 20 C.F.R. § 404.1503). Further, the ALJ clearly articulated his reason for choosing not to follow the conclusory statement regarding Plaintiff's disability status: there is no documented evidence of treatment at APPCS until June 3, 2005 (after the letter was written). Thus, the statement could not be supported by objective medical evidence, and the ALJ acted appropriately when he chose not to adopt it. See Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

Third, Plaintiff makes issue out of his GAF score of forty on June 20, 2005 and GAF score of forty-five on April 18, 2006. See Pl.'s Mem. at 13. "The [GAF] Scale describes an

individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." Mathis v. Astrue, No. 3:06-cv-816-J-MCR, 2008 WL 876955, at *7, n. 4 (M.D. Fla. Mar. 27, 2008) (unpublished) (citing Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994) at 32). A GAF score between forty-one and fifty denotes "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV at 34 (emphasis omitted). While GAF scores have been frequently used in Social Security disability benefits determinations, courts have often given them limited weight. "Reliance upon a GAF score is of questionable value in determining an individual's mental functional capacity." Gasaway v. Astrue, No. 8:06-cv-1869-T-TGW, 2008 WL 585113, at *4 (M.D. Fla. Mar. 3, 2008) (unpublished) (citing Deboard v. Comm'r of Soc. Sec., No. 05-6854, 211 F. App'x 411, 415-416 (6th Cir. 2006) (unpublished)); see also Wind, 133 F. App'x at 692 n.5 (noting that the Commissioner of Social Security has indicated that GAF scores have no direct correlation to the severity of a mental impairment); Parsons, 2008 WL 539060, at *7 (same). Even so, "courts generally find that a GAF score of 50 or below is not in and of itself determinative of disability." Jones v. Astrue, 494 F. Supp. 2d 1284, 1288 (N.D. Ala. 2007) (citing, among others, Hillman v. Barnhart, 48 F. App'x 26, 30 n.1 (3d Cir. 2002) (unpublished) (noting a GAF score of fifty indicates a claimant is capable of performing some substantial gainful activity); Seymore v. Apfel, 131 F.3d 152, 1997 WL 755386 at *2 (10th Cir. 1997) (explaining that a GAF score of forty-five does not necessarily prove a claimant is unable to hold a job); but see Lloyd v. Barnhart, 47 F. App'x 135, 135 n.2 (3d Cir. 2002) (noting that a vocational expert opined that a GAF score below fifty indicates an inability to keep a job)). Plaintiff's GAF scores of forty and

forty-five assigned early in his treatment for depression are not, in and of themselves, indicative of a severe mental disorder.

Fourth, Plaintiff points to his numerous complaints regarding the symptoms of his depression made to his treating nurse practitioner Nurse Killian, treating psychiatrist Dr. Herbly, and therapist Mr. Paat, which occurred sporadically over the entire treatment period. See Pl.'s Mem. at 13. The undersigned is mindful that the evidence must not be reweighed; rather, it must be determined whether "the decision reached is reasonable and supported by substantial evidence." Cornelius, 936 F.2d at 1145 (quotation and citations omitted); see also McRoberts, 841 F.2d at 1080.

In finding Plaintiff did not suffer from a severe mental impairment, the ALJ assessed the evidence regarding Plaintiff's claimed mental impairment as follows:

> Although the claimant is alleging disability in part due to depression beginning February 2005, the evidence shows that he did not begin treatment for this until June 2005 (Exhibit 5F). He kept fairly regular appointments with a nurse practitioner, Betty Killian, from this time through September 2005. She initially prescribed Zoloft which she increased three times as well as added Seroquel and later Wellbrutin in August 2005. No changes were made in his medications during the last noted visit in September 2005 (Exhibit 5F/1), which suggests that his new medication regimen continued to effectively control his depression. Consistent with this, the evidence does not indicate that the claimant sought treatment for depression again until April 2005 when he was evaluated by a psychiatrist, Dr. Herbly, who recommended psychological intervention and prescribed Lexapro (Exhibit 11F/21 and 55). Dr. Herbly added Trazodone to the claimant's medication regimen in May 2006 and increased the Lexapro dosage on July 11, 2006. Subsequently, the therapist's progress note indicated a better prognosis from his previous visit and the psychiatrist's treatment notes show improvement in his mental status during his visit in November 2006, and no further changes in his medication regimen were noted through his most recent visit in February 2007 (Exhibit 11F), which suggests that his new medication regimen continued to effectively control his depression. The claimant has not required any psychiatric hospitalization and the evidence does not indicate that he experienced any medication side effects.

Tr. at 17.  The ALJ's assessment of the relevant medical documentation is supported by substantial evidence in the record.  The first documented treatment for depression-related issues occurred in June 2005 at APPCS.  See id. at 172-73.  At that time, Plaintiff was diagnosed with "M[ajor] D[epressive] D[is]o[rder], Rec[urrent], Severe" and was prescribed a regimen of medications to alleviate the symptoms of his condition.  Id. at 173.  During the next several visits, the dosage of medication was increased.  Id. at 171, 168, 170.  Eventually, during the last visit to APPCS on September 14, 2005, Plaintiff appeared to be improving overall, and the plan was to continue with his previous medications.  Id. at 167, 166.

Plaintiff did not appear for depression related complaints until seven months later, when he was seen for a psychiatric evaluation by Dr. Herbly at Shands Jacksonville on April 18, 2006.  Id. at 233.  At that time, Plaintiff was placed on Lexapro.  Id.  About a month later, Plaintiff had "some improvement in his symptoms."  Id. at 230.  On July 26, 2006, about two weeks after Plaintiff's Lexapro dosage was increased by Dr. Herbly on July 11, 2006, Plaintiff's therapist Mr. Paat opined, "With his behavior today, prognosis appears to be better than thought from his previous visit."  Id. at 235.   Finally, on February 14, 2007, although Plaintiff reported feeling tired and having somewhat low energy, he also reported having an "adequately controlled" mood with "no suicidal ideas."  Id. at 217.  Plaintiff was directed at that time to continue his previous medications.  Id.  Thus, the ALJ's conclusion that Plaintiff's "medical regimen . . . effectively controls his depression" is supported by substantial evidence in the record.  See Gibbs v. Barnhart, 130 F. App'x 426, 431 (11th Cir. 2005) (unpublished) (finding an ALJ's determination that a claimant's mental condition was

"controlled by medication, and, thus, was not a 'severe' impairment" was supported by substantial evidence).

Fifth, Plaintiff takes issue with the ALJ's characterization of Plaintiff's daily activities in assessing Plaintiff's RFC and using the activities to support the ALJ's findings related to the objective medical evidence. See Pl.'s Mem. at 14. The ALJ stated, "The claimant's testimony indicated that he drives, shops for groceries, drives to his doctor appointments once a week, and loads the dishwasher." Tr. at 18. Based on Plaintiff's ability to do these activities, the ALJ found "the subjective evidence of record supports the residual functional capacity and sustains the objective evidence[.]" Id. Plaintiff does not dispute that he engages in those daily activities; rather, Plaintiff points to his testimony during the hearing that he has "crying spells," "feelings of hopelessness," "decreased energy," and "difficulty dealing with people. . . [and] stress[.]" Id. at 292-93; see also Pl.'s Mem. at 14. However, at Plaintiff's last visit with Dr. Herbly on February 14, 2007, just two months before his hearing, Plaintiff only reported feeling tired and having "somewhat low" energy. Tr. at 217. Plaintiff did not report any crying spells, feelings of hopelessness, or difficulty dealing with people and stress. See id. In fact, Plaintiff's mood at that time was only "slightly depressed." Id. Thus, Plaintiff's testimony is inconsistent with the evidence of record in this regard.

Sixth, recognizing that the ALJ "did not rely upon [opinions of State agency consultants] to support his step two determination[,]" Plaintiff asserts that the consultants' opinions should be given "very little, if any" weight by this Court because those consultants never examined Plaintiff. Pl.'s Mem. at 15. The State agency medical consultants, Dr. Peterson and Dr. Vergara, assessed Plaintiff's medical records on October 19, 2005 and

January 5, 2006, respectively. See Tr. at 177-87, 196-201. Both doctors concluded Plaintiff suffers from functional limitations of "Mild" in the following areas: "Restrictions of Activities of Daily Living"; "Difficulties in Maintaining Social Functioning"; and "Difficulties in Maintaining Concentration, Persistence, or Pace[.]" Id. at 184, 199. The doctors further opined Plaintiff does not suffer from any "Episodes of Decompensation[.]" Id. at 184, 199.

The relevant section of the Social Security Regulations provides, "If we rate the degrees of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation to do basic work activities."[8] 20 C.F.R. § 404.1520a(d)(1); see also 20 C.F.R. § 404.1521. The findings in Plaintiff's case fall within the guidelines set forth in § 404.1520a(d)(1). Similar or even more substantial functional limitations as determined by an ALJ and state evaluators in other cases have failed to support a determination that a claimant's mental impairment was severe. See, e.g., Pettaway v. Astrue, No. 06-00880-WS-B, 2008 WL 1836738, at *16-17 (S.D. Ala. Apr. 21, 2008) (unpublished) (affirming the ALJ's finding that the claimant's impairment was not severe when difficulties with concentration, persistence, or pace were classified as "moderate" rather than "mild"); see also Ward v. Astrue, No. 3:00-cv-1137-J-HTS, 2008 WL 1994978, at *2-3 (M.D. Fla. May 8, 2008) (unpublished) (all mild restrictions). It is true that a non-examining consultative physician's opinion "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision." Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (internal citation omitted).

---

[8]     The four rated functional areas are: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3).

Although the ALJ did not rely on the opinions of State agency consultants in making his step two determination that Plaintiff does not suffer from a severe mental impairment, their findings are consistent with the other evidence in the record on this issue; thus, they provide further evidence in support of the ALJ's decision in this regard.

Plaintiff also argues that the opinions of State agency consultants should not be relied upon by this Court because the consultants did not have the opportunity to review Plaintiff's records from Shands Jacksonville, as they both rendered their opinions before Plaintiff started treatment there. Pl.'s Mem. at 15. While Plaintiff is correct in his observation that neither of the consulting doctors had the opportunity to review Plaintiff's later treatment records from Shands Jacksonville, the assessments of the consultative doctors likely would not change if given the opportunity to review those records. When Plaintiff started treatment at Shands Jacksonville in April 18, 2006, he complained of the same symptoms he had complained of during his previous treatment. See Tr. at 233, 267. Further, as discussed supra, Plaintiff appeared to respond well to the treatment provided by Dr. Herbly and Mr. Paat at Shands Jacksonville. Thus, Plaintiff's argument regarding the timing of the doctors' evaluations is not well taken.[9]

## B.    The ALJ's Assessment of Plaintiff's RFC

Plaintiff further argues the ALJ assigned a "deficient" RFC in finding that Plaintiff does not suffer from any mental limitations. Pl.'s Mem. at 16. According to Plaintiff, "substantial evidence does not support a finding that [Plaintiff] has 'no limitations of mental functioning.'" Id.    The undersigned has already found substantial evidence supports the ALJ's

---

[9]    In any event, as noted supra, the ALJ did not rely on these evaluations in making his step two determination regarding Plaintiff's non-severe mental impairment. See Tr. at 14.

determination that Plaintiff's mental impairment is not severe <u>supra</u> at Part IV.A. However,

in assessing a claimant's RFC, the ALJ "must consider limitations and restrictions imposed

by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8P, 1996 WL

374184 at *5; <u>see also</u> <u>Swindle</u>, 914 F.2d at 226 (stating "the ALJ must consider a claimant's

impairments in combination") (citing 20 C.F.R. § 404.1545; <u>Reeves v. Hickler</u>, 734 F.2d 519,

525 (11th Cir. 1984)).

> In assessing Plaintiff's RFC, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to occasionally lift and/or carry up to 20 pounds and frequently up to 10 pounds. He is able to stand and/or walk up to 6 hours in an 8-hour workday and sit up to 6 hours. Pushing and/or pulling are unlimited other than as indicated for lifting and/or carrying. He is able to climb, balance, stoop, kneel, crouch or crawl occasionally but should never climb ladders. He should avoid concentrated exposure to heights or moving machinery. He has no limitations of mental functioning.

Tr. at 15. In assessing the RFC, the ALJ indicated he "adopt[ed] the medical opinions of

State agency medical consultants at the initial and reconsideration level regarding the

claimant's abilities to do work-related activities (light work) (Exhibits 7F and 9F)." <u>Id.</u> at 18.

Upon review of the record, it is evident that the ALJ did adopt the State agency consultants'

recommendations regarding Plaintiff's RFC. <u>See</u> <u>id.</u> at 188-95, 202-09. Of note, neither of

the consultants commented on Plaintiff's alleged mental impairment in their RFC

assessments (both having previously determined that he did not suffer from a severe mental

impairment after lengthy evaluations) or any effects that alleged impairment would have on

Plaintiff's RFC. <u>See</u> <u>id.</u>

> It appears the ALJ relied on the both the consultants' respective determinations that

the alleged mental impairment does not limit Plaintiff's functioning, and on the absence of

medical documentation in the record of any functional effects of the alleged mental impairment, to determine that Plaintiff does not have any mental functioning limitations. Plaintiff asserts it was error for the ALJ to find he does not have any mental functioning limitations, but fails to point to specific evidence in the record purporting to show that he does.[10]  See Pl.'s Mem. at 16.  It being clear that the ALJ took into account Plaintiff's claimed mental impairment when assessing his RFC (by his specific finding of "no limitations of mental functioning"), and in the absence of Plaintiff pointing to specific evidence contradicting that finding, the undersigned finds that the ALJ properly assessed Plaintiff's RFC.

## V.  Conclusion

The ALJ's determination that Plaintiff does not suffer from a severe mental impairment is supported by substantial evidence.  Further, the ALJ properly assessed Plaintiff's RFC regarding Plaintiff's alleged mental impairment.  In accordance with the foregoing, it is hereby **ORDERED**:

1.    The Clerk of the Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **AFFIRMING** the Commissioner's decision.

2.    The Clerk is directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida on March 31, 2009.

kaw
Copies to:
Counsel of record

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

---

[10]    Plaintiff merely argues "this finding is clearly contradicted by the medical evidence of record and [Plaintiff's] testimony."  Pl.'s Mem. at 16.

-23-